IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| **KIMBERLY S. WILEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Case No. 08-3347-CV-S-RED |
| | ) | |
| **OZARKS MEDICAL CENTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. 27), Plaintiff's Motion in Limine (Doc. 37), and Defendant's First and Second Motions in Limine (Docs. 38, 39). Upon careful consideration, Defendant's Motion for Summary Judgment is **GRANTED** (Doc. 27). By way of that ruling, Plaintiff's Motion in Limine (Doc. 37) and Defendant's First and Second Motions in Limine (Docs. 38, 39) are **DENIED** as moot.

## BACKGROUND

Plaintiff Kimberly S. Wiley is a former employee of Defendant Ozarks Medical Center ("Ozarks"). On January 10, 2008, Dr. Eck performed outpatient surgery on Wiley to remove a lipoma. Wiley informed Ozarks of the pending surgery on January 9, 2008, stating she thought she would be off work three to four weeks. In a post-operation consultation on January 21, Dr. Eck said the incision looked good and showed no signs of infection.

Wiley met with Dr. Eck again on January 28. During that consultation Dr. Eck told Wiley he would support her being off work one more week, until February 4. On January 25, Ozarks sent Wiley paperwork necessary for her to obtain leave pursuant to the Family Medical Leave Act ("FMLA"), including a healthcare provider form. On January 29, Dr. Eck filled out the form,

releasing Wiley to return to work on February 4 without restriction. On February 11, Wiley emailed her supervisor, Shawna Sanders, and falsely stated the incision was infected and that she was on antibiotics. Wiley now admits Dr. Eck told her the incision was not infected and admits she did not take antibiotics. On February 18, Ozarks received the form from Dr. Eck.

During the time Wiley was on leave, Ozarks' policies required employees returning from FMLA leave be certified fit for duty by Dr. Jordan at Ozarks Works. Typically, employees called to schedule an appointment two weeks prior to their return to work date. Even though she knew on January 28 that Dr. Eck had cleared her for work beginning February 4, Wiley did not call to schedule her appointment with Dr. Jordan until February 13. Wiley met with Dr. Jordan at 8:45 a.m. on Wednesday, February 20. Dr. Jordan certified Wiley fit to return to work as of that date. Wiley did not return to work that day and did not come into work until the following Monday, February 25.

Sanders decided to terminate Wiley because Dr. Eck had released her to return to work on February 4, Dr. Jordan had certified her as fit to work the morning of February 20, and Wiley nonetheless did not come to work on February 20. Sanders completed a disciplinary action form sometime between February 20 and 25 in which she stated her reasons for terminating Wiley: "[Wiley] did not return to work as outlined by [her] physician on [her] leave of absence forms. [Wiley failed] to communicate with HR and [her] supervisor on when [she was] to return to work. [Wiley failed] to work with HR and/or [her] supervisor regarding whether or not [she] needed more time off." Sanders reported the date of incident as February 20.

On February 25, Wiley attempted to return to work. Sanders approached Wiley, handed her the paperwork, and told her she was terminated. Wiley alleges Sanders then said "you've really

2

screwed me over" and "I don't see your health situation, or your parents' health situation, getting any better." Wiley appealed her termination through various levels at Ozarks, and her appeals were denied. Wiley had previously taken a three month leave of absence while Sanders was her supervisor due to knee surgery. In response to that leave, Sanders made no negative comments, did not seem upset, and did not seem to have any problems with Wiley's leave of absence.

Wiley filed suit against Ozarks, alleging wrongful termination in violation of the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. § 213.010 et seq. (2009), the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. § 12101 et seq. (West 2009), and the FMLA, 29 U.S.C.A. § 2601 et seq. (West 2009). Ozarks filed a Motion for Summary Judgment on August 28, 2009.

## ANALYSIS

Courts review ADA, MHRA, and FMLA retaliation claims under the *McDonnell Douglas* burden-shifting analysis. *Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 n. 4 (8th Cir. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)); *Phillips v. Mathews*, 547 F.3d 905, 912 (8th Cir. 2008). The employee must first prove a *prima facie* case of discrimination. *Dovenmuehler*, 509 F.3d at 439. For Wiley to state a disability discrimination claim, she must prove she suffers from "a disability within the meaning of the ADA or MHRA." *See Id.* For her ADA claim, Wiley must also prove "she suffered an adverse employment action because of her disability." *Id.* Similarly, for her MHRA claim, Wiley must prove her disability was a contributing factor to her termination. *See Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 819 (Mo. 2007). If Wiley meets her burden, Ozarks then must demonstrate a "legitimate, nondiscriminatory reason for the adverse action." *See Phillips*, 547 F.3d at 912. If Ozarks gives such a reason, Wiley "must come forward with evidence that creates an issue of fact as to whether the asserted reason was

3

pretext for discrimination." *Id.*

<u>WILEY WAS NOT PERCEIVED AS DISABLED WITHIN THE MEANING OF THE ADA OR MHRA</u>

Ozarks argues Wiley was not disabled or perceived as disabled within the meaning of the ADA or MHRA because 1) Wiley admits in her Petition that her medical condition only "temporarily prohibited her from working," 2) Wiley went to work on February 25, 2008, appearing ready, willing, and able to perform her job duties, and 3) Dr. Eck and Dr. Jordan medically cleared Wiley as able to work. Wiley does not contend she was disabled under the ADA or MHRA. Rather, Wiley argues she was regarded as having a disability based on Sanders' knowledge of her medical condition and Sanders' statement that she did not see Wiley's medical condition improving.

To prove she was perceived as disabled, Wiley must show she was regarded as having "a physical, sensory, or mental impairment which materially limits one or more major life activities," including "caring for one's self, performing manual tasks, walking, seeing, hearing, breathing, learning, and working." *Dovenmuehler*, 509 F.3d at 439 (quoting *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 948 (8th Cir. 1999)). Courts consider "1) the nature and severity of the impairment, 2) its duration or anticipated duration, and 3) its long-term impact" when determining whether a person is regarded as disabled. *Powers v. Auto Zone, Inc.*, No. 04-3048-RED, 2006 WL 461092, *5 (W.D. Mo. Feb. 23, 2006) (citing 29 C.F.R. § 1630.2(j)(2)(i)-(iii)). Wiley must show she was regarded as suffering a "significant reduction in meaningful employment opportunities" as a result of her impairment. *See Id.* (citing *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 488 (8th Cir. 1996)).

To be disabled under the ADA, a person must have a permanent or long-term impairment and "impairments while recovering from surgery" do not suffice. *Gutridge v. Clure*, 153 F.3d 898,

4

901 (8th Cir. 1998) (citing 29 C.F.R. Pt. 1630, App. § 1630.2(k); *Heintzelman v. Runyon*, 120 F.3d 143, 145 (8th Cir. 1997)). In a case interpreting the MHRA, the plaintiff was not perceived as disabled because the plaintiff merely "suffered from a temporary injury which did not substantially limit a major life activity," as evidenced by the company doctor's statement the plaintiff was able to continue working. *Cook v. Atoma Int'l of Am., Inc.*, 930 S.W.2d 43, 47 (Mo. Ct. App. 1996). Wiley relies on *Cook* to support her contention that Sanders regarded Wiley as disabled.

This case is similar to *Cook* in that Wiley's doctor and Ozarks' doctor found Wiley able to return to work and Wiley's Petition admits she was suffering from a temporary condition. However, dissimilar to *Cook*, Sanders' comment that she did not see Wiley's health situation getting any better, while somewhat ambiguous, can in the context of this summary judgment motion be considered as some evidence Sanders believed Wiley's condition was long-term and permanent.

When Sanders' statement is considered together with relevant undisputed facts, however, there is no remaining genuine issue of material fact regarding whether Sanders perceived Wiley as disabled. Sanders had no reason to regard Wiley as disabled because she knew Wiley would only be out for a minor surgery that would not impair any major life activity. Sanders did not see Wiley as suffering a significant reduction in meaningful employment opportunities because Wiley told Sanders she only expected to be out three to four weeks; because when Sanders decided to terminate Wiley, Sanders knew two doctors had cleared her as fit to work; and because Wiley in fact showed up on February 25 appearing ready, willing, and able to perform her job duties. The undisputed evidence shows that all of the facts available to Sanders support Ozarks' contention that Sanders only perceived Wiley's impairment as temporary, and a temporary impairment does not qualify as a disability under the MHRA or the ADA. Wiley wants to take one of the three statements Sanders

made on February 25 to support her claim of "perceived disability." However, Wiley selectively disregards a second statement made by Sanders, "you've really screwed me over." The clear inference in this statement is that Sanders was well aware of and upset about the fact that Wiley had been untruthful at worst or evasive at best about her return to work. The crux of this issue centers around the undisputed evidence that Wiley had a short term temporary need to be off work that she tried to stretch out to a longer term by being untruthful and non responsive to her employer. Accordingly, Wiley's ADA and MHRA claims fail.[1]

Having granted summary judgment on Wiley's ADA and MHRA claims, Wiley's FMLA claim remains. Summary judgment is appropriate on that claim if Ozarks had a legitimate, nondiscriminatory reason for terminating Wiley, and said reason was not mere pretext for discrimination.

<u>OZARKS HAD A LEGITIMATE, NONDISCRIMINATORY REASON FOR TERMINATING WILEY</u>

Ozarks asserts it terminated Wiley for failing to timely return from her leave of absence, a violation of company policy. Wiley did not return to work until three weeks after Dr. Eck had medically cleared her and five days after Dr. Jordan certified her as fit for work. Ozarks also asserts it terminated Wiley for other violations of company policy, including failure to communicate with human resources and her supervisor about when she would return to work. Wiley does not argue these reasons are illegitimate, but rather only argues these reasons were pretext for discrimination.[2]

---

[1]Because the Court grants summary judgment on Wiley's MHRA and ADA claims based on Wiley's failure to meet the disability element, we do not review Ozarks' arguments regarding whether Wiley suffered an adverse employment action because of her impairment.

[2]Although not among Sanders' reasons for terminating Wiley, it is interesting to note that during the litigation process Ozarks discovered Wiley had made a substantial misrepresentation to Ozarks by telling Sanders her incision was still infected and she was still on antibiotics as of

WILEY HAS NOT RAISED A FACT QUESTION AS TO WHETHER OZARKS' PROFFERED
REASONS FOR TERMINATING HER WERE MERE PRETEXT

Ozarks asserts Wiley cannot show Ozarks' reasons were pretext for disability discrimination or FMLA retaliation. Courts recognize several methods of proving pretext: 1) "the employer's proffered reason has no basis in fact," 2) "the employee received a favorable review" shortly before termination, 3) "similarly situated employees who did not engage in the protected activity were treated more leniently," 4) "the employer changed its explanation for why it fired the employee," or 5) "the employer deviated from its policies." *Phillips*, 547 F.3d at 913. Courts also consider temporal proximity of the protected activity and the decision to terminate, although courts are hesitant to find pretext solely based on temporal proximity. *See Quick v. Wal-Mart Stores*, 441 F.3d 606, 610 (8th Cir. 2006).

Wiley received a favorable review several months prior to termination. However, when she received the favorable review, Ozarks had no knowledge of the information that led to her termination. Thus, the review is irrelevant to this Court's analysis. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002) (finding a good review irrelevant to the pretext issue, although given just a few days before the plaintiff's termination, because the good review was given prior to discovering the plaintiff was far behind on work, which was the reason for discharge).

Wiley argues her alleged violation of company policy and failure to communicate with human resources or Sanders had no basis in fact and therefore was mere pretext for discrimination. Ozarks' Major Disciplinary Rules, which if violated could result in discharge, included "unauthorized absence from assigned work area," "no-call/no-show (Failure to comply with

---

February 11. This fact clearly shows that Wiley was misrepresenting material facts to her employer in order to delay her return to work, despite her being able to work.

departmental call-in procedures)," and "failure to return from Leave of Absence." Wiley argues she kept in regular contact with Sanders while on leave and therefore did not violate company policy. However, Wiley does not contest that she was not in contact with Sanders from January 21 to February 7, a time period during which Wiley discovered she could return to work February 4. This admitted period of no company contact at a time when Wiley had learned of significant information concerning her return to work was a violation of company policy. Furthermore, Wiley has not contradicted the fact that Sanders did not discover until February 18 that Dr. Eck released Wiley as able to work on February 4. Wiley does not contradict that she did not return to work until February 25, although she was released by Dr. Jordan as fit for duty on February 20. Assuming that Wiley did keep in contact with Sanders, as she claims, the beneficial value to Wiley is negated by the fact that she was not being truthful in her contacts and Sanders found out about her untruthfulness regarding Dr. Eck on February 18 and her noncompliance with Dr. Jordan's release on February 20. Finding a basis in fact that Wiley did not keep in regular contact with Sanders, did not comply with department call-in procedures, and did not timely return from her leave of absence, Ozarks' proffered reasons for terminating Wiley are not mere pretext.

Wiley next argues because she could not return to work on February 4, but rather could only return to work after meeting with Dr. Jordan, Ozarks' proffered reason of terminating her for failing to return from her leave of absence has no basis in fact and is pretext. This Court disagrees. On January 28, Dr. Eck told Wiley he would support her taking off work only until February 4. Nonetheless Wiley did not call to schedule an appointment with Dr. Jordan until February 13. This delay (January 28 to February 13) was not coincidental as it is undisputed that two days before (February 11) Wiley totally misrepresented her condition to her supervisor in what can only be

8

determined to be an effort to conceal her misconduct. There is no benefit of the doubt available to Wiley on this issue. Because there is a basis in fact that Wiley did not timely return from her leave of absence, Wiley has not shown that reason was mere pretext.

Because Wiley has not created an issue of fact as to whether Ozarks' proffered explanation for her termination was mere pretext for discrimination, Wiley fails on the pretext element, and summary judgment is appropriate on Wiley's FMLA claim.[3]

## CONCLUSION

Summary judgment is appropriate on Wiley's MHRA, ADA, and FMLA claims. Wiley's MHRA and ADA claims fail because Wiley has not created an issue of fact regarding whether she was perceived as disabled within the meaning of those statutes. Ozarks has proffered a legitimate, nondiscriminatory reason for terminating Wiley. Wiley has not raised a fact issue regarding whether Ozarks' explanation for terminating her was mere pretext for discrimination, making summary judgment appropriate on Wiley's MHRA, ADA, and FMLA claims.

**IT IS SO ORDERED**.

DATED:  November 24, 2009       /s/ Richard E. Dorr
                                RICHARD E. DORR, JUDGE
                                UNITED STATES DISTRICT COURT

---

[3]Summary judgment is also appropriate on Wiley's MHRA and ADA claims for the reasons given in this section, as Wiley had the same burden of proof on the pretext element for those claims.